**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | | |
|---|---|---|
| JACKIE LYSENGEN, on behalf of the Morton Buildings, Inc. Leveraged Employee Stock Ownership Plan, and on behalf of a class of all other persons similarly situated, | ) ) ) ) ) ) | |
| *Plaintiff,* | ) ) | CIVIL ACTION NO. 1:20-cv-01177-MMM-JEH |
| v. | ) ) | |
| ARGENT TRUST COMPANY, JAN ROUSE, EDWARD C. MILLER, GETZ FAMILY LIMITED PARTNERSHIP, ESTATE OF HENRY A. GETZ, and its beneficiaries and successors, and ESTATE OF VIRGINIA MILLER, and its beneficiaries and successors. | ) ) ) ) ) ) ) ) | JUDGE MICHAEL M. MIHM MAGISTRATE JUDGE JONATHAN E. HAWLEY |
| *Defendants.* | ) ) | |

**DEFENDANT ARGENT TRUST COMPANY'S OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

FACTUAL BACKGROUND ....................................................... 3

    A.    The Allegations in the Complaint and Its Class Definition ................. 3

    B.    The ESOP Transaction ........................................................ 4

    C.    Financing the Leveraged Transaction, the Impact of the KSOP, and Valuation Methodology ................................................. 7

    D.    Plaintiff's Pleaded Claims Conflict With Her Testimony, and the Varying Positions of the Purported Class Members ........................... 13

STANDARD OF REVIEW ....................................................... 13

ARGUMENT ..................................................................... 15

I.    The Putative Class Fails the Strict Requirements of Rule 23(b)(1) Because of Conflicts and Unique Defenses Within the Proposed Class Based On Members' Holdings in the ESOP and KSOP ................................ 15

II.    The Class Fails the Requirements of Rule 23(a) ........................... 21

    A.    The Putative Class Fails the Commonality and Typicality Requirements Because Its Proposed Members Have Divergent Interests Based on Their Holdings in the ESOP and KSOP ............... 21

    B.    Plaintiff is Not an Adequate Representative ....................... 22

        1.    Plaintiff Testified to a Radically Different Harm From That Alleged in the Complaint.......................... 22

        2.    Plaintiff is Subject to a Unique Spoliation Defense ................ 24

III.    CONCLUSION ........................................................... 26

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Arris Cable Modem Consumer Litig.*,
  327 F.R.D. 334 (N.D. Cal. 2018) ................................................................. 26

*CE Design Ltd. v. King Architectural Metals, Inc.*,
  637 F.3d 721 (7th Cir. 2011) ........................................................... 24, 25, 26

*Cent. States, Se. & Sw. Areas Pension Fund v. One Stop, Inc.*,
  2007 WL 7705585 (N.D. Ill. July 18, 2007) ............................................ 20

*Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of Chicago*,
  797 F.3d 426 (7th Cir. 2015) .................................................................. 14

*Clay v. Dart*,
  2021 WL 4264244 (N.D. Ill. Sept. 20, 2021) .................................... 23, 24

*Donovan v. Robbins*,
  99 F.R.D. 593 (N.D. Ill. 1983) .................................................................. 20

*Greene v. Mizuho Bank, Ltd.*,
  327 F.R.D. 190 (N.D. Ill. 2018) ................................................................ 25

*Hartford Fire Ins. Co. v. City of Mont Belvieu*,
  611 F.3d 289 (5th Cir. 2010) .................................................................... 20

*Howard v. Cook Cty. Sheriff's Office*,
  989 F.3d 587 (7th Cir. 2021) ........................................................ 21, 22, 24

*Krumwiede v. Brighton Assocs., LLC*,
  2006 WL 1308629 (N.D. Ill. May 8, 2006) ............................................. 26

*Lee v. Argent Tr. Co.*,
  2019 WL 3729721 (E.D.N.C. Aug. 7, 2019) ........................................ 7, 23

*Lewis v. McLean*,
  941 F.3d 886 (7th Cir. 2019) .................................................................... 25

*Martin v. Feilen*,
  965 F.2d 660 (8th Cir. 1992) ...................................................................... 4

*McFadden v. Bd. of Educ. for Ill. Sch. Dist. U-46,*
  2006 WL 681054 (N.D. Ill. Mar. 13, 2006) .......................................................... 24

*Mintel Int'l Grp., Ltd. v. Neergheen,*
  636 F. Supp. 2d 677 (N.D. Ill. 2009) ................................................................. 25

*Mooradian v. FCA US, LLC,*
  286 F. Supp. 3d 865 (N.D. Ohio 2017) ............................................................. 26

*Moore v. Gilead Scis., Inc.,*
  2012 WL 669531 (N.D. Cal. Feb. 29, 2012) ...................................................... 25

*Muro v. Target Corp.,*
  580 F.3d 485 (7th Cir. 2009) ............................................................................ 22

*Murray v. New Cingular Wireless Servs., Inc.,*
  232 F.R.D. 295 (N.D. Ill. 2005) ........................................................................ 23

*Ortiz v. Fibreboard Corp.,*
  527 U.S. 815 (1999) ............................................................................... 1, 14, 15

*Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n,*
  2011 WL 6819081 (N.D. Ill. Dec. 28, 2011) ............................................ 16, 19, 21

*Prudential Ins. Co. of Am. v. S.S. Am. Lancer,*
  870 F.2d 867 (2d Cir. 1989) ............................................................................. 20

*Pruitt v. Personnel Staffing Group, LLC,*
  2020 WL 3050330 N.D. Ill. (June 8, 2020) ....................................................... 26

*Spano v. Boeing Co.,*
  633 F.3d 574 (7th Cir. 2011) ..................................................................... *passim*

*State Farm Fire & Cas. Co. v. Frigidaire,*
  146 F.R.D. 160 (N.D. Ill. 1992) ........................................................................ 25

*Teamsters & Emp'rs Welfare Tr. of Ill. v. Gorman Bros. Ready Mix,*
  139 F. Supp. 2d 976 (C.D. Ill. 2001), *rev'd on other grounds,* 283 F.3d 877
  (7th Cir. 2002) .................................................................................................. 20

*U.S. Airways, Inc. v. McCutchen,*
  569 U.S. 88 (2013) ........................................................................................... 20

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) ................................................................. *passim*

**Statutes**

29 U.S.C. § 1023(b)(3) ........................................................................ 9

29 U.S.C. § 1103(a) ............................................................................ 4

**Rules**

Fed. R. Civ. P. 23(a) ................................................................. *passim*

Fed. R. Civ. P. 23(b)(1) ............................................................ *passim*

**Regulations**

29 C.F.R. § 2550.407d-6 .................................................................... 4

**Other Authorities**

129 Cong. Rec. S16629 (Daily ed. Nov. 7, 1983) .............................. 4

# INTRODUCTION

The amended complaint alleges that when the owners of Morton Buildings, Inc. ("Morton Buildings") sold all outstanding shares of the company's stock to its employees (through its ERISA-regulated employee stock ownership plan, the "ESOP"), the ESOP paid too much for the shares in that transaction. Plaintiff alleges the employee-participants suffered harm as a result.

Plaintiff seeks to certify a class of all other employee-participants in the ESOP. Plaintiff's class certification motion (the "Motion") argues that this case is a garden-variety ERISA lawsuit in which all employee-participants suffered the same plan-wide injury and class certification is virtually assured. But this approach eschews the "rigorous analysis" required by controlling authority as well as the unique facts of this case that make it an especially inappropriate vehicle for class-wide treatment. Indeed, the proposed class meets neither the requirements of Rule 23(b)(1)—the type of class action Plaintiff has chosen to pursue—nor the prerequisites established by Rule 23(a).

Certification of a Rule 23(b)(1) class requires an "identity of interest among all class members," and the Supreme Court has "cautioned strongly" against its overuse because it allows no opportunity for individuals to opt-out of the class. *Spano v. Boeing Co.*, 633 F.3d 574, 587 (7th Cir. 2011) (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 841-48 (1999)).

The facts here reveal just the sort of diverging interests that preclude certification of a mandatory class. Even before the ESOP acquired shares in Morton

Buildings, many employee-participants already owned shares of the company through a legacy retirement program called a "KSOP." Employee-participants can and did hold shares through their participation in either the KSOP or ESOP, *or both*, and the proposed class includes some employee-participants who hold shares in only the ESOP as well as others who hold shares in both. These two groups within the would-be class, however, have diverging interests. Putative class members who hold shares only in the ESOP may claim that they were injured by the ESOP overpaying in the ESOP transaction as a result of Argent's valuation analysis. But putative class members who hold shares in both the ESOP and KSOP benefited from that same challenged valuation analysis because it raised the value of such shares held in their KSOP accounts. Plaintiff's choice to pursue a "mandatory" class under Rule 23(b)(1)—which eliminates members' ability to opt-out of the class to address their own circumstances—makes this conflict unavoidable and dooms her Motion. Thus, the Motion can be denied for failure to satisfy Rule 23(b) alone.

The Motion also fails because Plaintiff cannot satisfy the commonality, typicality, and adequacy requirements of Rule 23(a). First, the class lacks commonality and typicality for many of the same reasons certification is improper under Rule 23(b)(1)—the material dissimilarities in the claims of (and defenses against) class members who held shares in only the ESOP versus those who held shares in both the ESOP and KSOP. Second, Plaintiff is not an adequate representative of the class because (i) in her deposition, she made clear that her concern is a drop in value associated with shares held in her *KSOP* account, a claim

2

at odds with the complaint's allegations regarding the price paid for shares in the *ESOP*; and (ii) she is subject to a unique defense based on her spoliation of evidence that is not shared by others she purports to represent.

## FACTUAL BACKGROUND

### A.     The Allegations in the Complaint and Its Class Definition

Plaintiff alleges that Defendants violated ERISA when they caused the ESOP to purchase company shares "for more than fair market value" in the transaction.  *See* Amended Complaint, ECF No. 57 ¶ 3 (hereafter "Compl.").  Plaintiff alleges two facts to support her claim: (1) that Morton Buildings' share price rose from its year-end 2016 valuation to the ESOP transaction share price on May 8, 2017, and (2) that the company's share price decreased following the transaction.  *Id.* ¶ 55.  The Complaint asserts three claims against Defendant Argent Trust Company ("Argent"): (1) that Argent caused the ESOP to enter a prohibited transaction forbidden by ERISA § 406(a) (Count I); (2) that Argent breached its fiduciary duties under ERISA § 404(a) (Count II); and (3) that Argent's indemnification agreement with Morton Buildings violates ERISA under ERISA §§ 410 and 404(a) (Count III).  *Id.* at 14-18.  Plaintiff also alleges that Defendants Edward Miller, the Getz Family Limited Partnership, the Estate of Henry A. Getz, and the Estate of Virginia Miller are liable under ERISA § 502(a)(3) for knowingly participating in a transaction prohibited by ERISA (Count IV).  *Id.* at 19-20.[1]

---

[1]     Plaintiff originally named Jan Rouse as a defendant, but the Court dismissed Rouse with prejudice. *See* 11/23/2021 text order.

Plaintiff seeks to certify a class defined as: "All participants in the Morton Buildings, Inc. Leveraged Employee Stock Ownership Plan and the beneficiaries of such participants as of the date of the May 8, 2017 ESOP Transaction or anytime thereafter," excluding the selling shareholders and related parties. *See* ECF No. 55 at 1 & n.1.

### B.    The ESOP Transaction

To understand the reason this case is a poor candidate for class certification, it is important to unpack the ways in which employees came to own Morton Buildings' shares, the company's unique business model, and the valuation analysis that underlies the allegations in the complaint. Because Plaintiff's Motion ignores these facts, we provide the following background.

An ESOP is a type of ERISA-regulated retirement plan that allows participating employees to acquire the sponsoring company's stock. *See* 29 U.S.C. § 1103(a); 29 C.F.R. § 2550.407d-6. A company that utilizes such a plan is colloquially referred to as "employee-owned," and employee ownership is precisely what Congress had in mind when it authorized such plans under the statute. *See Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir. 1992) (citing 129 Cong. Rec. S16629, S16636 (Daily ed. Nov. 7, 1983)).

Morton Buildings designs and builds structures for farm, commercial, and residential use. Declaration of Jeffrey S. Russell ("Russell Decl.") Ex. 1 at ARGENT_LYSENGEN_00022396. After nearly 100 years operating as a family-run business, the family shareholders decided to sell it. *See* Mem. Op. & Judgment, *Getz v. Morton Buildings, Inc., et al.*, No. 15-CH-351 (Tazewell Cty., Ill.), ECF No. 18-4 at

4

5-6 (hereafter "State Court Order").[2]  After considering a sale of the company to a private equity firm, the families opted instead to sell the company to the employees through an ESOP transaction.  Russell Decl. Ex. 1 at ARGENT_LYSENGEN_00022707 (stating "the owners, particularly Henry Getz, liked the concept of selling to the ESOP as they felt it would be better for the employees").

The ESOP then was created through a transaction in which the newly-formed ESOP gained 100% of the shares of Morton Buildings for the benefit of employee-participants at no cost to them.  *See* Compl. ¶ 5.  Before the transaction that created the ESOP, the employees already owned a portion of Morton Buildings—17.4%—through the Morton Buildings, Inc. 401(k) and ESOP ("KSOP").[3]  Russell Decl. Ex. 1 at ARGENT_LYSENGEN_00022401.  To finance the purchase of the remaining shares at no additional cost to employees, the ESOP purchased them through a combination of cash and loans.  *See* Argent Answer ¶ 5 (ECF No. 58); Miller & Rouse Answer ¶ 5 (ECF No. 59).

Argent, a professional independent trust company, was hired as trustee and, pursuant to its engagement, negotiated the terms of the deal on the ESOP's behalf for the benefit of the employee-participants.  Compl. ¶ 6.  Argent engaged Prairie

---

[2]   Before Plaintiff brought this lawsuit, the ESOP transaction was challenged in Illinois state court, which determined that the transaction price was fair.  *See infra* at 6.  The state court's order provides useful background and is cited here for that purpose.

[3]   A KSOP is a qualified retirement plan that combines stock ownership and a traditional 401(k). The company typically matches employee contributions with stock rather than cash.  *See* https://www.investopedia.com/terms/k/ksop.asp.

Capital Advisors as its valuation advisor and the law firm of Morgan Lewis & Bockius as legal counsel.  State Court Order at 23.  On the other side of the transaction, the selling shareholders included members of the Miller and Getz families, including Henry Getz.  *Id.* at 5.  Morton Buildings hired Chartwell Financial Advisory, Inc. as its valuation advisor for the transaction.  *Id.* at 13.

In December 2015, as the parties began to negotiate price and terms, the proposed transaction was challenged in Illinois state court.  *See generally* State Court Order.  The plaintiffs in that lawsuit alleged that the proposed transaction was substantively and procedurally unfair.  *Id.* at 2.  The two sides nonetheless continued their negotiation, exchanging five different offers and counteroffers before reaching a per-share price of $73 for the transaction.  Russell Decl., Ex. 1 at ARGENT_LYSENGEN_00022409; State Court Order at 27-28.  The negotiations then paused, pending the outcome of the state court litigation.  Russell Decl. Ex. 1 at ARGENT_LYSENGEN_00022410.  On November 14, 2016, the state court issued a 39-page opinion ruling against the plaintiffs on all claims, holding that the agreed-upon price was substantively fair, and that Argent's work was procedurally fair and ensured that the ESOP employee-participants would not pay more than fair market value for the acquired shares.  State Court Order at 23, 27-28.

Thereafter, negotiations resumed, and the transaction closed on May 8, 2017 at a purchase price of $75.25, which accounted for the company's updated financial performance and business outlook since the 2016 negotiations.  Russell Decl. Ex. 1 at ARGENT_LYSENGEN_00022410-11; *see also* Russell Decl. Ex. 6, Hansberger Dep.

at 171:7-173:11 (Marc Hansberger, member of Argent ESOP committee, confirming he drafted the Argent transaction report included in Exhibit 1 to the Russell Declaration).  The $75.25 share price was *below* the value estimates from Prairie, Argent's valuation advisor.  Russell Decl. Ex. 1 at ARGENT_LYSENGEN_00022434 (showing share price range of ██████████).

## C.     Financing the Leveraged Transaction, the Impact of the KSOP, and Valuation Methodology

Because the ESOP financed its acquisition of company shares in part through debt (a leveraged transaction), the equity value of the company *after* the transaction was lower than the purchase price.  *See* State Court Order at 30.  Any homebuyer will recognize why this is so:  When an asset is purchased with debt, the *equity* in the asset after the purchase will be the difference between the market price of the asset and the debt (*viz.*, mortgage) undertaken to finance it.  *Lee v. Argent Tr. Co.*, 2019 WL 3729721, at *3 (E.D.N.C. Aug. 7, 2019).  This is precisely what happened here: The ESOP purchased Morton Buildings shares for a price of $75.25 in May 2017.  At the end of 2017, the *equity* value of those same shares—that is, the value of the shares accounting for the debt the company took on to finance the purchase—was $33.78 per share.  Russell Decl. Ex. 2 at 5.  As documents from the time of the transaction reflect, valuation experts predicted this, and also predicted the value of the shares would increase over the five-year debt repayment period (just as a homeowner gains equity in a home as she pays down her mortgage).  Russell Decl. Ex. 1 at ARGENT_LYSENGEN_00022683 ("[p]ost transaction, the Company will have significant leverage thereby reducing the equity value of the Company" and

"negatively impact[ing]" the company's share price in the short term); State Court Order at 30-31.

The ESOP transaction also anticipated that employee-participants in the KSOP, who already owned shares of Morton Buildings through the KSOP, would experience the same drop in the equity value of their shares of company stock immediately following the ESOP transaction (for the reason described above) and might not see a recovery in value in the short term.   Russell Decl. Ex. 1 at ARGENT_LYSENGEN_00022683.   To address this expected and inevitable consequence of leverage, Argent negotiated into the ESOP deal a "price protection" provision for KSOP employee-participants.   *Id.* at ARGENT_LYSENGEN_00022408. This provision mandated that, over the next five years, KSOP employee-participants who were cashed out of their KSOP shares[4] would receive payment for such shares at a price equal to the share value had the company *not* incurred debt to fund the ESOP transaction, or the share value at the time they were cashed out, whichever was higher.   *Id.* at ARGENT_LYSENGEN_00022683; Russell Decl. Ex. 3 at LYSE000916-917; *see also* Russell Decl. Ex. 4, Lysengen Dep. at 134:9-136:14.   As discussed *infra* at pages 15-22, this price protection term is a critical reason Plaintiff's proposed class cannot be certified.

The KSOP is relevant here for a second reason that bears on class certification.

---

[4]     Price protection applied to KSOP participants who terminated employment at Morton Buildings (1) for any reason after reaching age 65; (2) because of death; (3) because of disability; or (4) because of reduction in force.   Russell Decl. Ex. 3 at LYSE000917.

Each year, Morton Buildings' shares held by the KSOP are valued.[5]  *See* 29 U.S.C. § 1023(b)(3).  On December 31, 2015, the shares in the KSOP were valued at $██████, and at year-end 2016 they were valued at $58.04 per share.  Russell Decl. Ex. 5 at ML00045590 (chart, at row labeled "Final Share Price").  The shares purchased by the ESOP were valued at $75.25 at the time of the May 8, 2017 ESOP transaction.  Compl. ¶ 5.  This apparent difference in share price ($58.04 at year-end 2016 for the KSOP shares vs. $75.25 in May 2017 for the ESOP shares) is attributable largely to the valuation professionals' recognition that the KSOP owned only a minority interest in the company (approximately 17%), while the ESOP gained a controlling interest in the company by buying all of its remaining shares.  Russell Decl. Ex. 1 at ARGENT_LYSENGEN_00022423.  What follows is a brief explanation of Morton Buildings' business model and accounting and valuation principles in the construction industry, which make clear why the valuation professionals believed this change in control mattered and was reflected in the different share prices.

When Morton Buildings takes on a new construction project, customers deposit 30% of the price upon signing a contract.  *Id.* at ARGENT_LYSENGEN_00022420.  They then pay 60% of the price when all materials are delivered and the remaining 10% upon completion.  *Id.*  As a result of this payment structure, the company carries on its balance sheet a large amount of cash, representing these upfront customer

---

[5]    Chartwell performed these annual KSOP valuations prior to 2015.  *See* Russell Decl. Ex. 5 at ML00045589.  After Chartwell began working as the family's advisor in late 2015, the KSOP trustees engaged Prairie to conduct the annual KSOP valuations, beginning with the year-end 2015 valuation.  *See id.*

payments. *Id.* In the year-end KSOP valuations *prior* to the ESOP transaction prepared by Chartwell and Prairie (*viz.*, the 2011 through 2016 year-end valuations), this excess cash (which the parties also referred to as "billings in excess of costs") was treated as a *liability* that reduced the company's equity value, rather than as an asset that would increase the equity value. *Id.* at ARGENT_LYSENGEN_00022423 (explaining that the excess cash had been treated "as a debt like component"). Chartwell, during the years it completed the annual KSOP valuations, concluded that treating the excess cash in this way—as a *liability* for purposes of the KSOP valuation—was proper because the KSOP held only a minority interest in the company and thus could not control how the excess cash was used (*e.g.*, for dividends paid to the KSOP or other purposes). *See id.*

Every valuation advisor who analyzed the company, however, agreed that the excess cash should be treated as an *asset* rather than a liability for purposes of negotiating the terms of the ESOP transaction. Chartwell concluded that the excess cash should be treated as an asset for the transaction because the ESOP was purchasing 100% of the company's shares—thus gaining a controlling interest in how the cash was used. State Court Order at 13-14 & n.2. Another financial advisor engaged by the company, R.W. Baird & Co. ("Baird"), agreed. *Id.* at 9-10, 14; Russell Decl. Ex. 1 at ARGENT_LYSENGEN_00022423.

Argent reviewed Chartwell, Prairie, and Baird's prior valuations and performed its own analysis. Russell Decl. Ex. 1 at ARGENT_LYSENGEN_00022423. As the ultimate decision-maker for the ESOP, Argent concluded that Morton

Buildings' unique payment structure, and historical ability to use the cash payments it received for work in progress as working capital to finance its operations, indicated that the excess cash should be treated as an equity-enhancing asset, irrespective of whether the company's shares were valued on a minority or controlling basis.  *Id.*; Russell Decl. Ex. 5 at ML00045590.  Treating the excess cash in this manner resulted in a significant difference between the year-end 2016 KSOP valuation and the agreed-upon share price in the ESOP transaction.  *See* Russell Decl. Ex. 6, Hansberger Dep. at 128:8-131:17 (testifying that the price increase in Prairie's KSOP valuation from year-end 2015 to its valuation summary for ESOP transaction purposes was attributable largely to "the treatment of cash"); Russell Decl. Ex. 7, Shuma Dep. at 33:10-35:12 (Richard Shuma, advisor to the selling shareholders, testifying to the substantial difference in Morton Buildings' valuation when treating the excess cash as a liability versus an asset); Russell Decl. Ex. 8 (exhibit discussed at cited portion of Shuma deposition); *see also* Russell Decl. Ex. 9 Plaintiff's Interrogatory Response No. 5.

Because Argent concluded that this determination did not hinge on whether the shares being evaluated for purchase by the ESOP represented a minority or controlling interest, Argent also concluded that past valuations—which had treated the cash as a liability—meant that KSOP employee-participants who were cashed out in prior years received too little for their shares.  *See* Russell Decl. Ex. 1 at ARGENT_LYSENGEN_00022423 (Argent concluded that "participants who were previously paid out should be made whole using a corrected valuation approach");

11

Russell Decl. Ex. 5 at ML00045590. Thus, the historical valuations of the KSOP from 2011 to 2016 were corrected to reflect (the correct) higher share prices, and to ensure that eligible KSOP employee-participants who had terminated employment were made whole for the prior undervaluation of their shares. *Id.*; Russell Decl. Ex. 10 at ARGENT_LYSENGEN_00043683-00043684.

Specifically, Morton Buildings filed applications with the Internal Revenue Service ("IRS") and Department of Labor ("DOL") to correct the past valuations to reflect the higher share price. Russell Decl. Ex. 5. The IRS approved the application on July 16, 2018, and the company withdrew its application with the DOL after the DOL took no position on it. *See* Russell Decl. Ex. 11; Russell Decl. Ex. 12. As a result, the year-end 2016 KSOP valuation that Plaintiff highlights in her complaint was corrected from $58.04 to $72.57. Russell Decl. Ex. 5 at ML00045590 (chart at row labeled "Final Share Price"), ML00045594 (chart at row "Adjusted Final Share Price"). The company subsequently made cash payments to the employee-participants whose KSOP shares had been valued with the corrected methodology at the time they had been cashed out of the KSOP following their termination of employment. *See* Declaration of Elizabeth Lowery, filed under seal ("Lowery Decl.") ¶ 5.

Plaintiff held shares in the KSOP during the years in which the pre-ESOP transaction valuations were made and, as a result of the corrective filings, received ███████ after she left Morton Buildings. *Id.* ¶¶ 5-8 & Ex. A.

12

### D. Plaintiff's Pleaded Claims Conflict With Her Testimony, and the Varying Positions of the Purported Class Members

The complaint pleads claims based on the price at which Morton Buildings' shares were purchased in the ESOP transaction, and specifically that the ESOP paid *too much* for the shares it purchased. *See* Compl. ¶¶ 3, 55, 56, 58. The complaint says nothing about Plaintiff's actual, and very different grievance: that the value of *her shares held in her KSOP* dropped as a result of the transaction. *See* Russell Decl. Ex. 4, Lysengen Dep. at 19:24-20:2 (agreeing that her claimed damage is the drop in value of her shares in the KSOP), 26:3-8 (similar).

Plaintiff's KSOP shares were not eligible for the price protection discussed above, because she voluntarily chose to leave Morton Buildings at age 52. *See id*. at 48:6-24; *supra* n. 4. Plaintiff's specific circumstances and particular purported injury are not shared with many other putative class members. At present there are 1,441 fully vested ESOP participants, of whom 916 also hold shares in a KSOP account; and of those 916 participants, only *82* like the Plaintiff have terminated their employment in a manner making them ineligible for price protection. Lowery Decl. ¶¶ 9-10.

### STANDARD OF REVIEW

Rule 23 requires a party seeking to certify a class to fulfill two requirements. *See* Fed. R. Civ. P. 23(a)-(b); *Spano*, 633 F.3d at 582-83. Rule 23(a) imposes "prerequisites" for the representative to maintain a lawsuit on behalf of a class: including (i) commonality—that "there are questions of law or fact common to the class," (ii) typicality—that "the claims or defenses of the representative parties are

typical of the claims or defenses of the class" and (iii) adequacy—that the named plaintiff "will fairly and adequately protect" the class's interests.  Fed. R. Civ. P. 23(a).

The named plaintiff must also establish that the class qualifies for certification under at least one "type of class action[]" listed in Rule 23(b), here 23(b)(1), the only section of Rule 23(b) under which Plaintiff moves.  Rule 23(b)(1)(A) requires Plaintiff to show that class treatment is necessary because   "inconsistent or varying adjudications with respect to individual class members . . . would establish incompatible standards for the party opposing the class."  Rule 23(b)(1)(B) applies where "any individual adjudication by a class member disposes of, or substantially affects, the interests of absent class members."  *Ortiz*, 527 U.S. at 834.  Because of the "mandatory" nature of Rule 23(b)(1) with no opt-out rights, the Supreme Court has "cautioned strongly" against its overuse.  *Spano*, 633 F.3d at 587 (citing *Ortiz*, 527 U.S. at 841-48).  Liberally applying the rule "risks depriving people of one of their most important due process rights: the right to their own day in court."  *Id.*  Courts have thus set "strict" requirements for certifying a class under Rule 23(b)(1)(A) or (B), and require a complete "identity of interest among all class members."  *Id.* at 588.

The "party seeking class certification must . . . prove that there are *in fact* sufficiently numerous parties, common questions of fact or law, etc."  *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011).  The plaintiff must meet this standard "by a preponderance of the evidence."  *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015).  The court must perform a "rigorous analysis" that "probe[s] behind the pleadings" to determine whether the

facts support class-action treatment.  *Dukes*, 564 U.S. at 350-51.  This "rigorous analysis" will "[f]requently . . . entail some overlap with the merits of the plaintiff's claim."  *Id.* at 351.

## ARGUMENT

The record shows inherent conflicts and dissimilarities among the putative class members—turning upon whether the class members participated in the KSOP as well as the ESOP—that preclude a mandatory Rule 23(b)(1) class.  Nor can Plaintiff meet the prerequisites of Rule 23(a).

## I. The Putative Class Fails the Strict Requirements of Rule 23(b)(1) Because of Conflicts and Unique Defenses Within the Proposed Class Based On Members' Holdings in the ESOP and KSOP

Rule 23(b)(1)(A) and (B)—the provisions of Rule 23(b) under which Plaintiff seeks to certify the class—require a strict "identity of interest among all class members."  *Spano*, 633 F.3d at 588; *Ortiz*, 527 U.S. at 846-47 (explaining that a mandatory class under Rule 23(b)(1) is an "exception" to "deep-rooted historic tradition that everyone should have his own day in court," and therefore has a higher "burden of justification").  This required "identity of interest" is absent because of significant distinctions arising from two groups within the putative class: (1) employee-participants of the ESOP who also participated in the KSOP ("ESOP/KSOP participants"), and (2) employees who participated in only the ESOP ("ESOP-only participants").  As addressed below, first, there are inherent conflicts between these two groups because while the complaint alleges that all ESOP participants were harmed by the price paid in the transaction, the alleged conduct underlying the claims benefited ESOP/KSOP participants.  *See Spano*, 633 F.3d at 588 (no "identity

15

of interest" where "the alleged conduct harmed some participants and helped others"). Second, there is no identity of interest among the ESOP/KSOP participants because each is subject to the defense of unjust enrichment, which requires an individualized assessment of their claims that is anathema to class certification. *See Dukes*, 564 U.S. at 366 (a mandatory class "cannot be certified where doing so prevents a defendant from litigating its defenses to individual claims"); *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 2011 WL 6819081, at *15 (N.D. Ill. Dec. 28, 2011) (mandatory Rule 23(b)(1) class not appropriate where the availability of relief for each class member required an individualized assessment).

***Inherent Conflicts Within the Class***.  There are inherent conflicts between the ESOP/KSOP participants and ESOP-only participants because the same conduct by defendants—specifically, the treatment of excess cash when valuing the company—benefited ESOP/KSOP participants (via their KSOP shares) while purportedly harming ESOP-only participants.  To explain: The complaint asserts that the agreed-upon price in the ESOP transaction overvalued Morton Buildings' shares, which it calls a "strange[]" rise in price from the December 2016 KSOP valuation of $58.04 to the $75.25 per share ESOP transaction price in 2017.  Compl. ¶ 55.  The KSOP valuation referenced in the complaint was based on treating the company's excess cash as a liability, a treatment the valuation advisors deemed appropriate at the time because, they reasoned, the KSOP held a minority interest and could not control that cash.  *See supra* at 9-10.  In the ESOP transaction, however, the same advisors regarded the cash as an asset because the ESOP was acquiring a controlling

16

interest, which was a substantial reason for the higher share price that Plaintiff's counsel finds "strange[]." *See id.*   Argent agreed that the excess cash should be treated as an asset when negotiating the ESOP transaction, but also believed that the pre-transaction KSOP valuations should have used the same approach, and this higher value is reflected in the corrected submission to the IRS. *Supra* at 10-12.[6]

Argent's position on the excess cash caused ESOP/KSOP participants to benefit in two ways that are not applicable to ESOP-only participants:

(1) ESOP/KSOP participants received *retrospective* benefits in connection with their shares held in the KSOP.  In order to conform the valuation methodology employed in the ESOP transaction to the prior valuations for the KSOP, Argent insisted that the company correct its past KSOP valuations to treat its excess cash as an asset, and to pay former KSOP employee-participants for past under-valuations. *See id.*  KSOP participants like Plaintiff who had cashed out their shares in the KSOP before the corrections were made thus received substantial cash payments based on the consistent application of the valuation methodology.  Lowery Decl. ¶¶ 4-5.

(2) ESOP/KSOP participants also received *prospective* benefits in connection with their KSOP shares because of the price protection provision.  That provision allowed eligible employee-participants who left the company within five years of the ESOP transaction to cash out their shares in the KSOP at a value that assumed the company had never conducted a leveraged ESOP transaction, and thus incurred no

---

[6]    The fair comparison for the $75.25 transaction price is thus not the $58.04 2016 KSOP valuation referenced in the complaint, but rather to the corrected $72.57 figure accepted by the IRS.  *See id.*

17

debt. *See supra* at 8. As a result, the price-protected KSOP share values were higher than the share values held in the ESOP post-transaction. Moreover, the price-protected KSOP shares were valued using the very methodology used for the ESOP transaction that Plaintiff challenges (*see* Russell Decl. Ex. 9 at Interrogatory Response 5)—treating the company's excess cash as an asset that increases its equity value. *See supra* at 8, 11-12. The prospective effect on the price-protected shares from using that valuation methodology is reflected in the following chart:

| Valuation Date | ESOP Share Price Without Price Protection | Price-Protected KSOP Share Price |
| --- | --- | --- |
| 12/31/2017 | $33.78 | ███████[7] |
| 12/31/2018 | $29.48 | ███████[8] |
| 12/31/2019 | ██████ | ███████[9] |
| 12/31/2020 | ██████ | ███████[10] |

As is apparent, the KSOP employee-participants who were eligible for price protection and have cashed out their KSOP shares within five years of the ESOP transaction have retained a clear benefit from the corrected valuations.

These facts place putative class members in starkly different positions. ESOP/KSOP participants benefited from the treatment of cash as an asset with respect to their shares in the KSOP, while Plaintiff's counsel contend that same

---

[7]   *See* Russell Decl. Ex. 13 at ARGENT_LYSENGEN_00028113 (row labeled "Final Share Price").

[8]   *See id.* at ARGENT_LYSENGEN_00028114 (row labeled "Final Share Price").

[9]   *See id.* at ARGENT_LYSENGEN_00028115 (row labeled "Final Share Price").

[10]   *See* Russell Decl. Ex. 14 (row labeled "Final Share Price").

treatment harmed ESOP-only participants by raising the purchase price for the shares they now hold in the ESOP.  That dichotomy creates the precise conflict that defeats Rule 23(b)(1) certification under controlling precedent.  *Spano*, 633 F.3d at 588.  In *Spano*, the plaintiffs alleged a violation of ERISA because Boeing mismanaged employees' retirement plans, including by making available imprudent investment options.  *Id.* at 576, 586.  But the class that the district court certified included class members who likely suffered no damage as a result of the challenged actions based on the dates they invested and then exited the funds.  *Id.* at 587.  The Seventh Circuit found that the "identity of interest" required for certification under Rule 23(b)(1) was absent due to those inherent conflicts, because the adjudication of the class representatives' claims could not be dispositive of all claims of all class members.  *Spano*, 633 F.3d at 588.  For the reasons described above, that is the precise situation here.

***ESOP/KSOP Participants are Subject to Individualized Defenses***.  The required identity of interest for a mandatory Rule 23(b) class is also absent where class members are subject to defenses that raise individualized fact-specific inquiries. *Dukes*, 564 U.S. at 361-62, 366; *Pa. Chiropractic Ass'n*, 2011 WL 6819081, at *15. Here, because the challenged conduct benefited the ESOP/KSOP participants included in the putative class for the reasons stated above, the ESOP/KSOP participants are exposed to the defense of unjust enrichment.  They are in the untenable position of arguing that the treatment of excess cash produced a "strange[]" rise in the price of the company's shares in the ESOP transaction, which they allege

19

caused them damages, while benefiting from the simultaneous increased valuation of their KSOP shares resulting from the same valuation approach.

The attempt to maintain conflicting positions that would result in a windfall is just what the defense of unjust enrichment forbids. *See Teamsters & Emp'rs Welfare Tr. of Ill. v. Gorman Bros. Ready Mix*, 139 F. Supp. 2d 976, 984 (C.D. Ill. 2001), *rev'd on other grounds*, 283 F.3d 877 (7th Cir. 2002); *Prudential Ins. Co. of Am. v. S.S. Am. Lancer*, 870 F.2d 867, 871 (2d Cir. 1989) ("[E]quity . . . abhors a windfall."). The ESOP/KSOP participants are thus estopped from asserting a claim for damages when they benefited from the very conduct they now challenge, pursuant to the doctrine of quasi-estoppel. *See Hartford Fire Ins. Co. v. City of Mont Belvieu*, 611 F.3d 289, 298 (5th Cir. 2010) (a party is precluded "from asserting . . . a right inconsistent with a position previously taken"); *Cent. States, Se. & Sw. Areas Pension Fund v. One Stop, Inc.*, 2007 WL 7705585, at *13 (N.D. Ill. July 18, 2007) (same). Equitable defenses apply with full force to the equitable claims created by ERISA. *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 95-99 (2013) (acknowledging the availability of equitable defenses in ERISA cases where a contractual provision does not override the availability of the defense); *Donovan v. Robbins*, 99 F.R.D. 593, 599 (N.D. Ill. 1983).

This defense necessarily leads to an individualized inquiry into the share holdings of each ESOP/KSOP participant in the proposed class. The Court cannot determine—without impermissible individual fact-finding—whether each ESOP/KSOP participant benefited or was "harmed" (that is, whether the value of

20

their participation in the KSOP outweighs the value of their participation in the ESOP).  That individualized inquiry destroys the identity of interest required for a mandatory class under Rule 23(b)(1).  *Dukes*, 564 U.S. at 361-62, 366; *Pa. Chiropractic Ass'n*, 2011 WL 6819081, at *15.[11]

## II.   The Class Fails the Requirements of Rule 23(a)

### A.   The Putative Class Fails the Commonality and Typicality Requirements Because Its Proposed Members Have Divergent Interests Based on Their Holdings in the ESOP and KSOP

Rule 23(a) requires commonality among proposed class members' interests—that is, that their claims "depend upon a common contention" and "that the class members have suffered the same injury."  *Dukes*, 564 U.S. at 350.  But a "common contention" is not alone sufficient to satisfy the rule—the contention must also "generate common *answers* apt to drive the resolution of the litigation."  *Id.* (emphasis in original).  "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."  *Id.*  Typicality asks a question related to commonality: whether the claims of a class representative (and any associated defenses) are typical of the claims of the purported class.  *See Howard v. Cook Cty. Sheriff's Office*, 989 F.3d 587, 605-06 (7th Cir. 2021).  Commonality and typicality "tend to merge," and both assess whether the named plaintiff's claim and the class

---

[11]   For this same reason, breaking the proposed class into subclasses of ESOP/KSOP participants versus ESOP-only participants is no cure.  Of the 1,441 fully vested ESOP participants, 916 also hold shares in the KSOP.  Lowery Decl. ¶¶ 9-10.  *Any* class involving ESOP/KSOP participants will not be able to satisfy the strict "identity of interest" requirement of Rule 23(b)(1), because determining whether each was unjustly enriched from the challenged conduct requires an individualized assessment.  *Pa. Chiropractic Ass'n*, 2011 WL 6819081, at *15.

claims are sufficiently interrelated.  *Dukes*, 564 U.S. at 349 n.5.

Plaintiff cannot meet the commonality and typicality requirements because the putative class members are situated differently based upon their share holdings in the KSOP, ESOP, or both.  As explained above (*supra* Argument Section I), these disparate holdings lead to diverse factual and legal questions depending on the amount of company shares a class member had in her KSOP or ESOP account.  Gains on KSOP shares may swamp any purported "loss" in ESOP shares.  The answer to whether a class member was harmed by the allegations in the complaint thus depends upon whether she participated in the KSOP as well as the ESOP.  Because not all members of the class participated in the KSOP, there is a variance among the class members that defeats the commonality and typicality requirements.  *See Dukes*, 564 U.S. at 350; *accord Howard*, 989 F.3d at 606 (harassment claims); *Muro v. Target Corp.*, 580 F.3d 485, 492-93 (7th Cir. 2009) (Truth in Lending Act claims).

Indeed, Plaintiff's individual circumstances make her especially atypical of other class members because she elected to leave employment voluntarily and was not eligible for price protection, a circumstance she shares with roughly only 6% of the putative class members.  Lowery Decl. ¶¶ 9-10.  In this way, Plaintiff's individual circumstances render her profoundly atypical of other class members, and therefore an unsuitable class representative.  *See Howard*, 989 F.3d at 606.

**B.    Plaintiff is Not an Adequate Representative**

     **1.    Plaintiff Testified to a Radically Different Harm From That Alleged in the Complaint**

Rule 23(a)(4) requires that a named plaintiff have "[a]n understanding of the

22

basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery." *Murray v. New Cingular Wireless Servs., Inc.*, 232 F.R.D. 295, 300 (N.D. Ill. 2005) (quotations omitted). If a named representative lacks that baseline knowledge, and her "ignorance unduly impacts [her] ability to vigorously prosecute the action," she is not an adequate representative. *Clay v. Dart*, 2021 WL 4264244, at *6 (N.D. Ill. Sept. 20, 2021) (quotations omitted).

Here, the problem is not merely that Plaintiff does not understand the pleaded claims, it is that she wants to bring entirely different claims that conflict with and undermine the counts actually pleaded. In her deposition, Plaintiff repeatedly testified that the harm she has suffered is that *the value of her shares in the KSOP dropped* as a result of the ESOP transaction. *See supra* at 13. Plaintiff's personal theory of liability is not what her lawyers pleaded—*i.e.*, that the price of the company's shares was overvalued in the ESOP transaction. Rather, she in effect takes issue with the very occurrence of a leveraged transaction at all, since the shares in Plaintiff's KSOP temporarily dropped in value as a result of the debt used to fund the ESOP transaction. *See* State Court Order at 30; *Lee*, 2019 WL 3729721, at *3.

The radical difference between the complaint's alleged injury and Plaintiff's grievance voiced in her deposition cannot be ignored because they require different factual findings, theories of damages, and litigation strategies. For instance, Plaintiff's theory of damages for the claim she articulated at her deposition relates to only the drop in price of her KSOP shares, which were valued at $58.04 on the date of the ESOP transaction. Russell Decl. Ex. 1 at ARGENT_LYSENGEN_00022683.

23

But the damages calculation for the ESOP shares would use the $75.25 purchase price as the starting point. These opposing interests affect all aspects of this litigation from trial strategy to settlement, "unduly impact[] [Plaintiff's] ability to vigorously prosecute the action" (*Clay*, 2021 WL 4264244, at *6), and underscore that Plaintiff's pursuit of her claims will not "necessarily benefit the class as well." *Howard*, 989 F.3d at 605; *see also McFadden v. Bd. of Educ. for Ill. Sch. Dist. U-46*, 2006 WL 681054, at *6-7 (N.D. Ill. Mar. 13, 2006) (denying certification where named representative's testimony revealed her claims did not fully align with the class). Because Plaintiff is committed to an idiosyncratic claim that is not aligned with the complaint, Plaintiff cannot meet the adequacy requirement.

### 2.    Plaintiff is Subject to a Unique Spoliation Defense

Plaintiff also fails Rule 23(a)'s adequacy requirement because she is subject to a unique defense. *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) (quotations omitted) ("The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation.").[12] The question is not the merits of this unique defense, but whether it is sufficiently colorable to render Plaintiff an inadequate representative. *See id.* at 726 (a unique defense need be only "arguable" to implicate the Rule 23 requirements); *Greene v. Mizuho Bank, Ltd.*, 327 F.R.D. 190, 197 (N.D. Ill. 2018).

---

[12]    As *CE Design* suggests, the presence of a unique defense also defeats Rule 23(a)'s typicality requirement. 637 F.3d at 726.

Plaintiff is subject to a unique spoliation defense based on electronic communications she had with other putative class members but deleted. *See Lewis v. McLean*, 941 F.3d 886, 892 (7th Cir. 2019) (explaining requirements for finding spoliation); *Mintel Int'l Grp., Ltd. v. Neergheen*, 636 F. Supp. 2d 677, 687 (N.D. Ill. 2009).

Defendants requested that Plaintiff produce all communications with other members of the putative class concerning the facts alleged in the complaint. *See* Russell Decl. Ex. 15 at Request For Production No. 18; Russell Decl. Ex. 16 at Request For Production No. 29. At her deposition, Plaintiff revealed that *after* she had signed paperwork to become the class representative, she had discussions with other potential class members via text and email about the facts of this case, but did not produce the texts and emails because she deleted them. Russell Decl. Ex. 4, Lysengen Dep. at 76:7-79:9, 80:5-81:13, 85:16-86:6.[13]

Plaintiff had a duty to preserve her communications about the case after she agreed to serve as class representative. *See State Farm Fire & Cas. Co. v. Frigidaire*, 146 F.R.D. 160, 163 (N.D. Ill. 1992) (finding spoliation where key evidence destroyed when plaintiff had not yet filed complaint); *Moore v. Gilead Scis., Inc.*, 2012 WL 669531, at *3 (N.D. Cal. Feb. 29, 2012) (plaintiff had duty to preserve evidence from the time he contacted attorney). And the fact that Plaintiff deleted the messages *after* she had signed paperwork to represent the class creates too much risk that there are

---

[13]     As of the date of this opposition, Plaintiff's counsel has not responded to defense counsel's inquiries as to whether these emails or text messages are recoverable.

issues unique to Plaintiff which will affect her ability to "vigorously represent the interests of the class." *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 357-58 (N.D. Cal. 2018); *see also CE Design Ltd.*, 637 F.3d at 726; *Krumwiede v. Brighton Assocs., LLC*, 2006 WL 1308629, at *8 (N.D. Ill. May 8, 2006) (finding spoliation). Courts have considered this very issue in denying class certification. *See, e.g.*, *Mooradian v. FCA US, LLC*, 286 F. Supp. 3d 865, 870 (N.D. Ohio 2017). Plaintiff's failure to retain these highly relevant communications also reveals that she is unwilling or unable to participate in discovery, and renders her an inadequate representative. *See Pruitt v. Personnel Staffing Group, LLC*, 2020 WL 3050330, at *6 (N.D. Ill. June 8, 2020). Plaintiff is thus not an adequate representative of the class. *CE Design Ltd.*, 637 F.3d at 726.

## III.  CONCLUSION

The proposed class contains members with irreconcilable conflicts, and the plaintiff is not an adequate representative of any class. The Court should deny Plaintiff's motion for class certification for the reasons stated above.

Dated: December 10, 2021

Respectfully submitted,

By: */s/ Jeffrey S. Russell*

Jeffrey S. Russell
Barbara A. Smith
Jacob B. Simon
BRYAN CAVE LEIGHTON PAISNER LLP
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
Telephone:  (314) 259-2000
jsrussell@bclplaw.com
barbara.smith@bclplaw.com
jacob.simon@bclplaw.com

*Attorneys for Argent Trust Company*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 10, 2021 I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.


*/s/ Jeffrey S. Russell*

**CERTIFICATION**

The undersigned attorney certifies that the foregoing memorandum complies with the type volume limitations of L.R. 7.1(B)(4), because it contains 6,920 words and 44,241 characters, inclusive of all headings, footnotes, and quotations.

*/s/ Jeffrey S. Russell*