E-FILED
Friday, 11 February, 2022 02:44:29 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| JACKIE LYSENGEN, on behalf of the Morton Buildings, Inc. Leveraged Employee Stock Ownership Plan, and on behalf of a class of all other persons similarly situated, <br><br> **Plaintiff,** <br><br> v. <br><br> ARGENT TRUST COMPANY, EDWARD C. MILLER, GETZ FAMILY LIMITED PARTNERSHIP, ESTATE OF HENRY A. GETZ, and ESTATE OF VIRGINIA MILLER <br><br> **Defendants.** | Case No. 1:20-cv-01177-MMM-JEH |

**PLAINTIFF'S OPPOSITION TO MOTION TO QUASH SUBPOENA AND/OR FOR PROTECTIVE ORDER**

The underlying litigation involves a May 2017 transaction in which Defendant Argent Trust Company ("Argent") represented the Morton Buildings, Inc. Leveraged Employee Stock Ownership Plan (the "ESOP") in the ESOP's purchase of Morton Buildings, Inc. ("MBI") stock from MBI's shareholders (the "ESOP Transaction"). As the ESOP's trustee, Argent was responsible for, among other things, conducting due diligence and negotiating the terms of the ESOP Transaction. A core dispute in the case is whether Argent caused the ESOP to pay more than "adequate consideration," an affirmative defense that will require Argent to establish both (1) the price paid by the ESOP for MBI stock was no more than fair market value and (2) Argent's process in reaching that conclusion was careful and independent.

Argent retained Prairie Capital Advisors, Inc. ("Prairie") to undertake a valuation of privately-held MBI, specifically on the fair market value of MBI stock. Prairie presented a report

to Argent containing its *conclusions* on value and Argent relied on those conclusions in buying MBI for the ESOP. Prairie's report and conclusions of value were based on a valuation model. The model includes information not available from other sources and relates directly to the key fair market value issues at the center of this case. Thus, Plaintiff requested the model from Prairie.

Prairie contends its model is highly confidential, proprietary business information. But there is a protective order in place precisely to safeguard the confidentiality of such information. Moreover, there does not appear to be any particularly unique intellectual property at issue as no patents, trademarks, or copyrights are implicated. We note, moreover, that Plaintiff's law firm has litigated numerous ESOP cases and the valuation firms have produced their valuation models as part of discovery. *See* Exhibit A, Declaration of Patrick Muench ("Muench Decl."), ¶ 6. In fact, the financial advisor to MBI (a direct competitor to Prairie in advising institutional trustees in ESOP transactions) produced numerous iterations of its model in this very case. *Id*. Prairie has made no showing that its models are so suffused with unique and valuable sensitive trade secrets and methods as compared to valuation models used by other firms.

Prairie contends the summary report provided to the trustee suffices. But the summary report fails even Prairie's own standards of what such a report should contain. In seeking to shield its analysis from scrutiny in its motion to quash, Prairie acknowledges that the audience of a valuation report should "***be able to re-create*** – how the analyst concluded the final value estimate." Prairie Memo. Supp. of Motion to Quash ("Prairie Mem.") p.6. Plaintiff's retained expert, however, was unable to recreate Prairie's analytics, model, and conclusion of value. *See* Exhibit B, Declaration of Daniel Van Vleet ("Van Vleet Decl."), ¶¶ 12-14. Further, the primary Prairie employee on the ESOP Transaction was unable to explain at deposition key aspects of the

2

valuation report and the underlying model driving it. Plaintiff is entitled to see how Prairie reached its conclusions. Plaintiff and the Court are entitled to all the facts and information considered in evaluating the transaction at issue and Prairie should not be allowed to hide its analysis from view and scrutiny based on conclusory, hypothetical fears, which are in any event contradicted by the record.

Plaintiff needs Prairie's highly relevant model to understand how it reached its conclusions. That need outweighs any allegedly *undue* burden that Prairie might hypothetically suffer. And in weighing those factors the Court should know that Prairie is not a typical uninterested third party being dragged into litigation in which it played no role and received no benefit. Prairie received considerable sums to provide valuation services to Argent and MBI that will be a central focus of the underlying litigation. And Prairie could serve as an independent appraiser to the buyer-side in the ESOP Transaction only if "the plan is . . . established as the appraiser's client." Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17,632, at 17,635 (proposed May 17, 1988) (to be codified at 29 C.F.R. pt. 2510).[1] This lawsuit seeks relief to the Plan—Prairie's and Argent's client—under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for losses arising from the faulty valuation they conducted. Prairie's and Argent's methods are essential to determining whether a good faith investigation was conducted and no more than fair market value paid by the Plan, in accordance with statutory requirements under ERISA sections 3(18)(B) and 408(e), 29 U.S.C. §§ 1002(18)(B), 1108(e). Moreover, Prairie effectively served as an agent of the Plan where it provided valuation services to the

---

[1] Although the Proposed Regulation was not finalized, the Seventh Circuit has adopted its two-part investigatory and fair market value standard for evaluating the adequacy of consideration in an ESOP transaction. *See Keach v. U.S. Tr. Co.*, 419 F.3d 626, 636 n.5 (7th Cir. 2005); *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 680-81 (7th Cir. 2014).

3

trustee acting on behalf of the Plan. Under analogous circumstances, legal advice to a trustee in carrying out its fiduciary duties is not shielded from discovery by participants under the attorney client privilege.

I. Background

The ESOP Transaction closed on May 8, 2017. Prairie was retained by Argent to act as its valuation advisor in October 2015. However, in December 2015, a lawsuit was filed in Tazewell County against MBI, Argent and two MBI Directors seeing to stop the potential transaction (the "Getz Litigation"). Prairie was not a party to the Getz Litigation. ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██ After the Getz Litigation was resolved in late 2016, Prairie re-started its work for Argent, concluding in draft reports that were provided to Argent on April 26, 2017 and discussed with Argent's ESOP Committee on May 4, 2017.

Plaintiff served a subpoena on Prairie around January 21, 2021 to gather information about Prairie's methods, analyses, and recommendations. Prairie produced documents around April 1, 2021. Instead of immediately moving to compel Prairie's model in response to Prairie's objections to discovery, Plaintiff sought to develop the information necessary to understand Prairie's valuation analysis by other means. Plaintiff's counsel and valuation expert examined the voluminous document productions by the parties and non-parties, but the document productions revealed little about Prairie's model. Plaintiff's counsel questioned Gregory Cook, Prairie's primary valuation analyst of MBI (who willingly provided Prairie's model to third

parties in the Getz Litigation), about Prairie's analysis and model.[2] Mr. Cook could not answer questions on Prairie's valuation and process. For example, Mr. Cook could not explain or did not know:[3] (i) who supplied the financial projections Prairie used in its valuations "without going into our model;" (ii) all the factors that supported the EBITDA margin improvements Prairie incorporated into its valuation "without doing the calculations;" (iii) how Prairie determined the retirement benefit expense so he "would have to go back in their model to see how this is being forecasted;" (iv) how much cash would be left with MBI after the ESOP Transaction closed; (v) the reasons behind working capital projections utilized in Prairie's valuation; (vi) to what extent industry trends were incorporated into the analysis; (vii) to what extent MBI's individual service lines impacted the financial projections Prairie used; (viii) whether Prairie's valuation included calculations for working capital requirements; (ix) whether and to what extent Prairie's financial projections included a future acquisition by MBI; (x) all the factors that contributed to Prairie's selection of a 4.5% additional risk premium in the Weighted Average Cost of Capital ("WACC") it utilized in its Discounted Cash Flow Method ("DCF") or how it calculated a 2.5% premium in a different report; and (xi) how much cash Prairie calculated MBI to need to run the business going forward. *See* Exhibit A.2, Muench Decl. attaching relevant portions of the Deposition Transcript of Greory Cook.

---

[2] Prairie implies that Plaintiff deposed two individuals who worked at Prairie during the relevant time period and were made available to answer questions on how Prairie reached its valuation conclusions in the ESOP Transaction, which is not accurate. Although Dick Shuma *currently* works at Prairie, he worked at BMO Harris in early 2015 and advised the Selling Shareholders in the ESOP Transaction—not Argent—and was questioned on his actions with BMO Harris.

[3] Additional instances in which Mr. Cook responded "I don't know" or "I can't recall" is listed in Dkt. 105-5, pgs. 2-5, in support of Prairie's Motion to Quash.

And there are numerous other items in Prairie's report that cannot be "re-created" and therefore require production of the model itself, including: (i) the nonrounded income statement projections used in the DCF from 2017 - 2026 and the Terminal Year, including the terminal year calculations; (ii) the nonrounded cash flow projections used in the DCF from 2017 - 2026, the Terminal Year, including the terminal year calculations and calculations used to determine the projected depreciation and amortization, projected capital expenditures, and the specific line items associated with working capital requirements; (iii) the calculations for income tax rate; (iv) the calculations for the low and high multiples applied in Prairie's Guideline Public Company method ("GPC"); (v) the nonrounded numbers and calculations in Prairie's equity value adjustments; (vi) the nonrounded data referenced in the control premium analysis; (vii) the nonrounded data referenced in the discount for lack of marketability analysis; (viii) the nonrounded line items from the historical income statement adjustments; (ix) all of the nonrounded underlying data used in the GPC method, including the data underlying Prairie's comparability analysis; (x) how Prairie calculated the levered beta it used in its WACC calculation or what information went into that conclusion; and (xi) what capital structure (debt to total capital) of the peer companies Prairie used in concluding a 30% ratio for MBI. *See* Exhibit B, Van Vleet Decl., ¶ 14.

In sum, Plaintiff has reviewed "Prairie's May 2017 valuation report and numerous other documents, emails, meeting notes and communications relating to the transaction" (Prairie Mem. p.3-4) but those materials do not answer the above sample of outstanding questions. Therefore, Prairie's report fails to meet its own requirement that the audience be able to re-create its report and determine how it reached its conclusions. Prairie's model should contain the equations, assumptions, and adjustments made to the financial data inputs and answers to the above

questions that are not found in Prairie's summary report and are not discussed in other documents produced in the underlying case. It is simply untrue that if "there is any question about what sources of information Prairie used, or how it reached its determination of the fair market value of the company, the answer can be found in Prairie's output report." Prairie Mem. p.8. Plaintiff cannot fully explore Prairie's valuation work, and therefore whether Argent can prove fair market value without this critical information.

## II.     Legal Standard

A third-party subpoena issued pursuant to Federal Rule of Civil Procedure 45 can command a person to testify and/or produce designated documents at a specified time and place. Fed. R. Civ. P. 45(a)(1)(A)(iii). "The scope of material obtainable pursuant to a Rule 45 subpoena is as broad as what is otherwise permitted under Rule 26(b)(1)." *Allstate Ins. Co. v. Electrolux Home Prod., Inc.*, No. 16-CV-4161, 2017 WL 5478297, at *2 (N.D. Ill. Nov. 15, 2017) (citation omitted). Therefore, one may obtain from a third party "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." *See* Fed. R. Civ. P. 26(b)(1). Proportionality requires consideration of "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id*.

Whether or not the information sought is otherwise discoverable, Rule 45 requires a court to quash a subpoena that "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). But the movant must establish that the burden caused by producing the responsive documents exceeds the benefit from the production of that information. *Phoenix Ins. Co. v. S.M. Wilson & Co.*, No. 20-cv-3063, 2020 WL 3124312, at *2 (C.D. Ill. June 12, 2020) (*citing Northwestern*

*Memorial Hosp. v. Ashcroft*, 362 F.3d 923, 927 (7th Cir. 2004) (denying motion to quash and noting that the movant "has the burden to show that the subpoena should be quashed").

**III.     Analysis**

      A.     *The information contained in Prairie's model is relevant.*

Prairie, wisely, does not argue that its model is not relevant to the underlying case. Because Argent relied on Prairie's valuation in agreeing to the price terms in the ESOP Transaction, how and why Prairie reached the conclusions it did is critical to both prongs of the adequate consideration test: did Argent cause the ESOP to pay more than fair market value and did Argent's process in reaching that conclusion rise to the elevated standards required of an ERISA fiduciary. As detailed above, Plaintiff is unable to fully evaluate the answer to those questions, and "re-create the final value estimate" without Prairie's model.

Without the model, Plaintiff cannot evaluate how Prairie arrived at the various inputs used in building up its DCF and GPC models. The request for the model is relevant to understanding the work conducted by Prairie and how the ultimate purchase price was determined. Within the model are equations, assumptions, and adjustments made to the financial data inputs that cannot be seen otherwise. The formulas in Prairie's model will show, for example, how Prairie arrived at its 4.5% additional risk premium; the precise financial projections it utilized; the precise terminal year calculations in the DCF; the calculation for the multiples in the GPC method; how Prairie arrived at its beta in the WACC calculation; what data was actually used in its control premium analysis; and what capital structure Prairie used for its comparable companies in the GPC method.

Plaintiff is entitled to all that information to properly and fully vet Prairie's analysis. As previous courts have found, this information goes to the heart of ESOP transaction litigation. In

*Perez v. Bruister*, 823 F.3d 250, 262-64 (5th Cir. 2016), the Fifth Circuit affirmed the district court's findings that the ESOP trustee failed to properly evaluate the valuation work performed by its financial advisor, including inflated assumptions used to determine the ultimate valuation of the ESOP. And in *Brundle v. Wilmington Trust N.A.*, 919 F.3d 763, 771-72, 777 (4th Cir. 2019), the Fourth Circuit affirmed the district court's findings that the ESOP's trustee failed to properly investigate its financial advisor's valuation work including inappropriate discounts and rounding in favor of the selling shareholders. And other courts have noted that native excel productions can be necessary to understand a document that has been converted to an image. *See, e.g., Aguilar v. Immigration & Customs Enf't Div. of U.S. Dep't of Homeland Sec.*, 255 F.R.D. 350, 354–55 (S.D.N.Y. 2008) ("a complicated spreadsheet may be difficult to comprehend without the ability to view the formulas underlying the output in each cell"); *In re Jemsek Clinic, P.A.*, No. 06-31766, 2013 WL 3994663, at *8 (Bankr. W.D.N.C. Aug. 2, 2013) ("embedded metadata is not typically visible to a user but may be necessary to understand the document, such as Excel spreadsheet formulae or hyperlinks"); *Dahl v. Bain Capital Partners, LLC*, 655 F. Supp. 2d 146, 150 (D. Mass. 2009) ("Native format means that the spreadsheets have certain search capabilities and attributes, such as formulae. Therefore, Rule 34 requires that the PE Firms produce the spreadsheets in native format, keeping these attributes and search capabilities intact"); *Green v. Monarch Recovery Mgmt., Inc.,* No. 1:13-CV-00418-SEB, 2014 WL 1631825, at *3 (S.D. Ind. Apr. 24, 2014) ("One of the unique strengths of Excel software is the ability to implement calculations and formulae that are not evident in a PDF version, so merely a PDF imprint of the surface information is not sufficient").

9

Plaintiff cannot fully explore the valuation work of Prairie and, therefore, cannot fully investigate the due diligence conducted by the ESOP's trustee without discovery on the assumptions and adjustments performed by Prairie.

> B. *Plaintiff's need for the relevant information in Prairie's model outweighs any purported "burden" to Prairie.*

Given the importance of, and Plaintiff's need for, the information contained in the model and the inability to obtain that information elsewhere, Prairie must present a compelling case of *undue* burden to shield its model from discovery. Prairie falls well short of that exacting standard, instead relying on hypothetical concerns that are contradicted by its own actions. Prairie's model is not a trade secret, and even it were, the existence of the entered protective order and Plaintiff's need for the information outweighs any unsupported claim of undue burden.

As an initial matter, Prairie's model is not a "trade secret." Prairie imports the definition of "trade secret" used in the Defined Trade Secrets Act (18 U.S.C. § 1893(3)), which requires that "the owner thereof has taken reasonable measures to keep such information secret." Prairie Mem. p.10. ███████████████████████████████████████████████████

10

██████████████████████████████████████████████████████████████

████████████████████████████

      And even if Prairie's analysis in this case was a "trade secret" ███████████████

████████████████████████████████████████████ there is a protective order in place to alleviate any potential harm. *See Fireblok IP Holdings, LLC v. Hilti, Inc.*, No. 19-cv-50122, 2021 WL 5283946 (N.D. Ill. Aug. 10, 2021) (denying motion to quash). A mere "preference for secrecy does not create a legal bar to disclosure." *Westmore Equities, LLC v. Vill. of Coulterville*, No. 15-cv-241, 2016 WL 8539974, at *2 (S.D. Ill. Jan. 25, 2016) (*citing Gotham Holdings, LP v. Health Grades, Inc.*, 580 F.3d 664, 665 (7th Cir. 2009)). Prairie's "concern" that its model "would be disclosed to expert witnesses that compete with Prairie in the ESOP valuation field" is pure conjecture. The cases upon which Prairie relies all involved <u>direct competitors</u>.[4]

      The factors that motivated decisions involving industrial processes and detailed customer lists to direct competitors do not exist here. Plaintiff's valuation expert, the Griffing Group, is not a direct competitor. *See* Exhibit B, Van Vleet Decl. ¶ 15. Given the Griffing Group's prior work as retained experts on behalf of ESOPs challenging the work of institutional trustees, it is highly

---

[4] *See Greater Rockford Energy and Tech. Corp. v. Shell Oil Co.*, 138 F.R.D. 530, 537 (C.D. Ill. 1991) ("ADM and Defendants are in direct competition concerning the sale of ethanol."); *Indiana Materials Processing, LLC v. Tire Waste Transp., LLC*, No. 15-mc-8, 2015 WL 1647461, *5 (N.D. Ind. Apr. 14, 2015) ("Tire Waste and IMP are competitors . . ."); *Suture Express Inc. v. Cardinal Health 200, LLC*, No. 14-cv-4737, 2014 WL 6478077, *6 (N.D. Ill. Nov. 18, 2014) (production would be made to "direct competitors"); *Cont'l Auto. Sys., U.S., Inc. v. Omron Auto. Elec., Inc.*, No. 14-cv-3731, 2014 WL 2808984, *1 (N.D. Ill. June 20, 2014) ("Omron is a direct competitor of Continental"). And the information sought from direct competitors in those cases involved customer information, basis for pricing the competitive produce, and industrial processes, information that is never disclosed. *See Greater Rockford*, 138 F.R.D. at 535-37 (direct competitor sought information on production costs and capacity; purchase amounts on a customer-by-customer basis, and profit and loss data); *Suture Express, Inc.*, 2014 WL 6478077 at *6 (direct competitor sought sales to each customer; profit margins, and how its competitor determines pricing); *Indiana Materials*, 2015 WL 1647461, *5 (competitor sought to inspect equipment that produces competitive product).

unlikely those trustees will hire the Griffing Group in the future (and indeed an institutional trustee terminated the Griffing Group's engagement upon learning of their work on behalf of ESOPs). *Id.* at ¶ 16. A court rejected a similar argument where the movant had not "advanced any proof that the [party requesting the information] intends to divulge the subpoenaed information for commercial purposes" and any potential concerns would be addressed by entry of a protective order. *Westmore Equities*, 2016 WL 8539974, at *2; *see also McGlenn v. Driveline Retail Merch., Inc.*, No. 18-cv-2097, 2020 WL 1955259, at *6 (C.D. Ill. Apr. 23, 2020) ("the Protective Order will adequately address McGlenn's concerns regarding disclosure); *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 13-cv-1054, 2014 WL 12733590, at *4 (C.D. Ill. Jan. 8, 2014) ("Keystone's argument that the Protective Order does not address its concerns is without merit.").

If Prairie's position is accepted it would mean valuation firms are immune from scrutiny from outside experts because any valuation firm is a potential competitor. And even in the fantasy world where a firm that has opined trustees have accepted shoddy valuations, such as the Griffing Group, is hired by those same trustees, the information here is not equivalent to customer lists or industrial processes. Valuation firms use the same basic methodologies—DCF and GPC. For that reason, financial models from even the most sophisticated financial firms (*e.g.*, Goldman Sachs, JP Morgan, and Lazard Freres) have provided their models to the Griffing Group. See Exhibit B, Van Vleet Decl. ¶ 17. There is nothing remarkable or special in Prairie's model that warrants enhanced protection. Indeed, in this very case, Prairie's direct competitor who was advising the sell-side on the ESOP Transaction, produced its models. *See* Exhibit A, Muench Decl. ¶ 6. And Chartwell's willingness to produce its model given the existence of a

protective order is consistent with Plaintiff' counsel's experience in other ESOP Transactions.[5] *Id.*

As listed above, there are numerous questions about how Prairie arrived at its valuation conclusions that cannot be answered from its report alone and were not answered by the individual at Prairie most involved in preparing the valuation upon which Argent relied. Those questions go well beyond the name of "the specific individual who retained Prairie" (Prairie Mem. p.14) but rather are necessary to "re-create" Prairie's analysis for which it was paid handsomely, so Plaintiff and the Court can determine whether the ESOP paid too much for MBI stock in the ESOP Transaction. Contrary to Prairie's conclusory statement that "Plaintiff already has the bases for Prairie's opinion as well as the underlying data"—it is precisely because Plaintiff does not have that information and Prairie's model is the only source of the information that mandates disclosure.

Prairie has failed to establish an undue burden that would allow it to shield its analysis from scrutiny. Plaintiff therefore respectfully requests that Prairie's Motion to Quash be denied.

Dated: January 24, 2022

Respectfully submitted,

**BAILEY & GLASSER LLP**

*/s/ Patrick O. Muench*
Patrick O. Muench
318 W. Adams St.
Suite 1606
Chicago, IL 60606
Telephone: (312) 500-8680
Facsimile: (304) 342-1110
pmuench@baileyglasser.com

---

[5] In another ESOP case, Plaintiff's counsel worked with the producing party to eliminate or minimize any technical issues those productions would have entailed while still allowing hidden formulas and other metadata to be viewed. Plaintiff's counsel proposed a similar approach here, but those efforts were rejected by Prairie.

Gregory Y. Porter
Ryan T. Jenny
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
gporter@baileyglasser.com
rjenny@baileyglasser.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of January, 2022, a copy of the foregoing was served via the CM/ECF system and email upon Defendants' and Movant's counsel:

    Jeffrey Russell
    Barbara Anne Smith
    Bryan Cave Leighton Paisner, LLP
    One Metropolitan Square
    211 North Broadway
    Suite 3600
    St. Louis, MO 63102
    (314) 259-2000
    Email: jsrussell@bclplaw.com
    Email: barbara.smith@bclplaw.com
        *Counsel for Defendant Argent Trust Company*

    Chelsea McCarthy
    Tammy Tabush
    Holland & Knight LLP
    150 N. Riverside Plaza
    Suite 2700
    Chicago, IL 60606
    (312) 263-3600
    Email: chelsea.mccarthy@hklaw.com
    Email: tammy.tabush@hklaw.com

    Lynn E. Calkins
    Holland & Knight, LLP
    Suite 1100
    800 17th Street NW
    Washington, DC  20006
    (202) 955-5564
    Email: lynn.calkins@hklaw.com

    Janaki Hannah Nair
    John Elias
    Elias Meginnes Riffle & Seghetti
    416 Main St.
    Ste 1400
    Peoria, IL 61602
    (309) 637-6000
    Email: jnair@emrslaw.com
    Email: jelias@emrslaw.com

*Counsel for Edward C. Miller, Estate of Henry A. Getz and Estate of Virginia Miller*

Patrick S. Coffey
Robert M. Romashko
HUSCH BLACKWELL LLP
Suite 2200
120 S Riverside Plaza
Chicago, IL  60606
(312) 655-1500
Email: patrick.coffey@huschblackwell.com
Email: robert.romashko@huschblackwell.com
　　*Counsel for Getz Family Limited Partnership*

David G. Lubben
DAVIS & CAMPBELL, LLC
401 Main Street, Suite 1600
Peoria, Illinois 61602
(309) 673-1681
Fax: (309) 673-1690
dglubben@dccamplaw.com

　　　　　　　　　　　　　　*/s/ Patrick O. Muench*
　　　　　　　　　　　　　　Patrick O. Muench

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| JACKIE LYSENGEN, on behalf of the Morton Buildings, Inc. Leveraged Employee Stock Ownership Plan, and on behalf of a class of all other persons similarly situated,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>ARGENT TRUST COMPANY, EDWARD C. MILLER, GETZ FAMILY LIMITED PARTNERSHIP, ESTATE OF HENRY A. GETZ, and ESTATE OF VIRGINIA MILLER<br><br>　　　　　Defendants. | Case No. 1:20-cv-01177-MMM-JEH |

## DECLARATION OF PATRICK O. MUENCH

I, Patrick Muench, declare as follows:

1. I am a member in good standing of the Bar of the State of Illinois. I was admitted to practice in this Court on March 12, 2020.

2. All the facts stated herein are true and correct within my personal knowledge, and if called as a witness, I could and would testify competently to the facts stated herein.

3. I am more than 18 years of age, am capable of making this declaration, and have personal knowledge of the following.

4. I make this declaration in support of Plaintiff's Opposition to Motion Quash Subpoena and/or for Protective Order in the above-captioned case.

5. I am a partner of the law firm of Bailey & Glasser LLP, counsel to Plaintiff in this lawsuit.

6. In other ESOP litigation, Bailey & Glasser LLP has received through discovery financial models from Prairie Capital Advisor's direct competitors. And the financial advisor to Morton Buildings, Inc., Chartwell Financial Advisors, Inc., produced many iterations of its financial model in response to a document subpoena issued in this case.

7. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

8. Attached as Exhibit 2 are true and correct portions of the deposition transcript of Gregory Cook taken on December 1, 2021.

I declare, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed at Chicago, Illinois this 24th day of January 2022.

By: */s/ Patrick O. Muench*

PATRICK O. MUENCH